IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF GEORGIA

SAVANNAH DIVISION

| | | |
|---|---|---|
| JAMES MITCHELL, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | CV 421-227 |
| | ) | |
| TIMOTHY C. WARD, Commissioner, | ) | |
| Georgia Department of Corrections, | ) | |
| | ) | |
| Respondent. | ) | |

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

Petitioner brings the above-captioned petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  The matter is currently before the Court on Respondent's motion to dismiss the petition as untimely, (doc. no. 10), which Petitioner opposes, (doc. no. 14).  For the reasons set forth below, the Court **REPORTS** and **RECOMMENDS** Respondent's motion to dismiss be **GRANTED**, (doc. no. 10), this petition be **DISMISSED** as untimely, and a final judgment be **ENTERED** in favor of Respondent.

**I.    Background**

In 2009, a jury in the Superior Court of Chatham County, Georgia, convicted Petitioner of felony murder, aggravated assault, and two counts of possession of a firearm during the commission of a felony, and the trial court sentenced Petitioner to life plus fifteen years in prison.  (Doc. no. 1, p. 1.)  The Georgia Supreme Court affirmed Petitioner's conviction on

February 6, 2012. Mitchell v. State, 722 S.E.2d 705, 708 (2012). Petitioner did not pursue any additional direct appeal proceedings. (Doc. no. 1, p. 2.)

Petitioner filed three state petitions for a writ of habeas corpus. He filed his first state petition in the Superior Court of Ware County on October 24, 2012, which was transferred to the Superior Court of Macon County. The Court held an evidentiary hearing on June 30, 2014, and dismissed the petition on February 13, 2015. (Doc. no. 1, pp. 3, 6; doc. no. 21-8, pp. 1-25.) In his federal petition, Petitioner first writes he did not appeal the denial of his first state petition, but then writes the Georgia Supreme Court denied him a certificate of probable cause ("CPC") for this first petition, (id. at 5, 8). From the unopposed record provided, it appears Petitioner did not attempt an appeal for his first state petition. (Doc. no. 10-1, p. 2.)

Petitioner filed his second state petition in the Superior Court of Mitchell County on September 27, 2016, which was dismissed on October 11, 2016. (Doc. 11-1, p. 35; doc. no. 1, p. 4.) Petitioner then applied for a CPC, but he withdrew his application on June 15, 2018. (Doc. 11-1, p. 26.)

Through counsel, Petitioner filed his third and final state petition in the Superior Court of Chatham County on July 18, 2018, which was transferred to the Superior Court of Mitchell County. (Doc. no. 1, pp. 4-5; doc. no. 11-2, p. 1.) The Court held an evidentiary hearing on December 9, 2019, and dismissed the petition on February 18, 2020. (Doc. nos. 11-1, 11-3.) The Georgia Supreme Court denied Petitioner a CPC on Augusta 24, 2020. (Doc. no. 11-4.)

Petitioner, represented by the same counsel,[1] filed the instant petition on August 10, 2021. (See doc. no. 1.) Petitioner raises several claims for relief based on alleged prosecutorial

---

[1] The Court granted counsel's motion to withdraw in an Order entered along with this Report and Recommendation. (Doc. no. 28.)

2

misconduct, newly discovered evidence, and ineffective assistance of counsel.[2]  (See id.) Respondent filed a motion to dismiss on February 14, 2022.  (Doc. no. 10.)  In response to the motion to dismiss, Petitioner states he "does not disagree with the procedural history as recited . . . and incorporates said history here by reference." (Doc. no. 14, p. 1.)  Petitioner argues his petition should not be dismissed despite its untimeliness because he qualifies for the actual innocence exception due to a Brady violation and out-of-court statements by Donald Robinson and Vincent Brown.  (See generally doc. no. 14.)  In light of Petitioner's argument, the Court ordered Respondent to supplement the record with (1) Petitioner's complete trial transcript; and (2) evidence of the Brady violation.  (Doc. no. 15.)  Respondent submitted a brief and the requested documents on June 27, 2022.  (Doc. nos. 19-21 to 21.)  The Court then gave Petitioner thirty days to file a reply brief and any further evidence supporting his claims, but Petitioner did not do so by the deadline.

## II.   The Petition Is Time-Barred

Pursuant to the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2244(d), there is a one-year statute of limitations for § 2254 motions that runs from the latest of:

> (1)(A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

---

[2]Petitioner has filed several amended petitions, all without leave of Court and in violation of Fed. R. Civ. P. 15(a)  (See doc. nos. 1, 2, 5, 18); see Thomas v. Sec'y, Dep't of Corr., No. 17-11357-B, 2018 WL 11303563, at *7 (11th Cir. July 31, 2018) (affirming denial of motion to amend § 2254 petition, noting application of Rule 15).  The Court will not consider these amended petitions, but they are largely repetitive of the initial petition's allegations.

3

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

(2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

Under § 2244(d)(1)(A), a judgment becomes final upon "the conclusion of direct review or the expiration of the time for seeking such review." Here, the Georgia Supreme Court affirmed Petitioner's conviction on February 6, 2012. Mitchell, 722 S.E.2d at 708. Petitioner did not seek a writ of certiorari from the United States Supreme Court, and his conviction therefore became final ninety days later on May 7, 2012. See Gonzalez v. Thaler, 565 U.S. 134, 150 (2012) (explaining judgment for petitioners who do not seek certiorari from United States Supreme Court becomes final at "'expiration of the time for seeking such review'—when the time for pursuing direct review in this Court, or in state court, expires."); see also Phillips v. Warden, 908 F.3d 667, 671 (11th Cir. 2018) (same).

Petitioner then had one year to file his federal petition or take other action to toll the one-year limitations period. The Court recognizes that, pursuant to 28 U.S.C. § 2244(d)(2), the one-year statute of limitations does not run while a properly filed application for state post-conviction relief or other collateral review is pending in state court. Cramer v. Sec'y, Dep't of Corr., 461 F.3d 1380, 1383 (11th Cir. 2006). Petitioner did not file any request for post-conviction relief until October 24, 2012, meaning 170 days of his one-year AEDPA statute of limitations had already expired. (Doc. no. 1, p. 3.) AEDPA's one-year clock was tolled throughout the first state habeas corpus proceedings, including the time during which

4

Petitioner was able to seek a CPC from the Georgia Supreme Court. Thus, the tolling resulting from Petitioner's first state habeas proceeding ended on March 16, 2015,[3] the thirty-day deadline by which the CPC application was due to the Georgia Supreme Court pursuant to O.C.G.A. § 9-14-52(b).

Despite 170 days of Petitioner's one-year statute of limitations having elapsed prior to filing his first petition, Petitioner then waited 561 days from the conclusion of his first state habeas proceedings on March 16, 2015, to file his second state petition on September 27, 2016. Therefore, AEDPA's one-year statute of limitations had already run when Petitioner filed his second and third state petitions, so those proceedings had no tolling effect. Because Petitioner filed his federal petition in August 2021, well after the expiration of the one-year statute of limitations, his current federal challenge is time-barred and should be dismissed.

### III. Petitioner Has Not Shown That a Fundamental Miscarriage of Justice Has Occurred

#### A. Fundamental Miscarriage of Justice and the Actual Innocence Exception

An otherwise untimely § 2254 petition may be considered if a petitioner can demonstrate that a fundamental miscarriage of justice has occurred.[4] A "fundamental miscarriage of justice" has occurred where "a constitutional violation has probably resulted in the conviction of one who is actually innocent." McQuiggin v. Perkins, 569 U.S. 383, 392

---

[3] Because day thirty fell on a Sunday, the deadline for filing a CPC application was extended to Monday, March 16, 2015.

[4] Equitable tolling may also be applied to prevent application of AEDPA's statutory deadline, but only if a petitioner "shows '(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way' and prevented timely filing." Holland v. Florida, 560 U.S. 631, 649 (2010) (quoting Pace v. DiGuglielmo, 544 U.S. 408, 418 (2005)). Petitioner does not argue for equitable tolling.

(2013) (citing Murray v. Carrier, 477 U.S. 478, 495-96 (1986)); see also Wyzykowski v. Dep't of Corr., 226 F.3d 1213, 1218-19 (11th Cir. 2000).  The actual innocence exception "is exceedingly narrow in scope," and a time-barred petitioner seeking to invoke it must be able "(1) to present 'new reliable evidence . . . that was not presented at trial,' and (2) to show 'that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt' in light of the new evidence."  Rozzelle v. Sec'y, Fla. Dep't of Corr., 672 F.3d 1000, 1011 (11th Cir. 2012) (citations omitted).  As the Supreme Court emphasized, "The miscarriage of justice exception, we underscore, applies to a severely confined category:  cases in which new evidence shows 'it is more likely than not that no reasonable juror would have convicted [the petitioner].'"  McQuiggin, 569 U.S. at 394-95.

Petitioner presents three pieces of evidence that, at least in combination, he believes would have led no reasonable juror to conviction: (1) an already established Brady violation undermining witness Isaac Fitzgerald's testimony; (2) witness Donald Robinson's post-trial recantation; and (3) non-witness Vincent Brown's ungiven testimony.  (See doc. no. 14, pp. 2-3.)

    **B.**    **Brady Violation**

Petitioner was indicted, tried, and convicted along with a co-defendant, Jarnard Williams.  Williams v. State, 722 S.E.2d 847, 848 (2012).  Like Petitioner, Williams's conviction was upheld on appeal, id., and Williams subsequently filed a petition for a writ of habeas corpus in Superior Court.  Unlike Petitioner, after Williams's first state petition was denied by the state courts, he timely filed a § 2254 petition in federal court.  The Court granted Williams's § 2254 petition after finding the prosecution violated its duties under Brady v. Maryland, 373 U.S. 83 (1963), by failing to disclose an unofficial leniency deal it made with

6

trial witness Isaac Fitzgerald, who identified Williams at trial. Williams v. Williams, 232 F. Supp. 3d 1318, 1324-33 (S.D. Ga.), *aff'd* 714 F. App'x 958 (11th Cir. 2017).

Fitzgerald also identified Petitioner, and that same Brady violation now constitutes Grounds Two and Three of the present petition. (Doc. no. 1, pp. 7-8.) The question presently before the Court is whether that established Brady violation satisfies the actual innocence exception, meaning whether the evidence underlying the Brady violation is new, reliable evidence not presented at trial that likely would have led no reasonable juror to a conviction. If the Court so finds, the petition may simply be *considered* despite its untimeliness.

First, the Court finds the evidence that constitutes the Brady violation is new evidence. Respondent incorrectly posits the evidence is not "new" because Petitioner knew of the evidence eight years prior when he raised the Brady violation as an amendment to his first state habeas petition. (Doc. no. 10-1, p. 11; doc. no. 20, p. 10.) For the actual innocence exception, evidence is "new evidence" if it was unavailable at trial and could not have been discovered earlier through the exercise of due diligence. Rivera v. Humphrey, CV 113-161, 2017 WL 6035017, at *11 (S.D. Ga. Dec. 6, 2017); see McQuiggin, 569 U.S. 383 at 384 (considering actual innocence evidence discovered six years before filing habeas petition). The evidence of the Fitzgerald deal was unavailable to Petitioner at trial and could not have been discovered with due diligence, so the evidence is new evidence for these purposes.

Second, Petitioner cannot establish a fair probability that no reasonable juror would have found him guilty in light of the Fitzgerald deal. The Supreme Court has addressed whether evidence of a Brady violation meets the high threshold of the actual innocence exception. In Sawyer v. Whitley, 505 U.S. 333, 349 (1992), the Supreme Court held, "[Brady violation evidence] brought forward to impeach a prosecution witness will seldom, if ever,

7

make a clear and convincing showing that no reasonable juror would have believed the heart of [the witness's] account of petitioner's actions." Three years later, the Court overturned the "clear and convincing standard" used in Sawyer in lieu of today's "more likely than not" standard, but the Court's view of impeachment evidence remains the same. Schlup v. Delo, 513 U.S. 298, 327 (1995); McQuiggin, 569 U.S. at 395.

In Calderon v. Thompson, 523 U.S. 538, 563 (1998), the Court held, "This impeachment evidence provides no basis for finding a miscarriage of justice. As in Sawyer, the evidence is a step removed from evidence pertaining to the crime itself." To find that impeachment evidence would have more likely than not changed an outcome, there must be little evidence aside from the now impeached witness's testimony, and the jury must have accepted that testimony without question. Id.; cf. High v. Head, 209 F.3d 1257, 1272 (11th Cir. 2000) ("We conclude, however, that in light of the substantial evidence that was produced at trial, including three different officers' testimony about [Petitioner's] confessions and the positive identification . . . none of this 'Impeachment evidence provides [a] basis for finding a miscarriage of justice.'") (quoting Thompson, 523 U.S. at 563); Wright v. Hopper, 169 F.3d 695, 704-05 (11th Cir. 1999) ("Additionally, even if the [withheld agreement] would have totally discredited [the trial witness], the State still had [other] testimony . . . in combination with the physical evidence, to support [Petitioner's] conviction."); see also Lynch v. Myers, No. 3:16CV73-WKW, 2018 WL 1867162, at *6 n.5 (M.D. Ala. Feb. 1, 2018), *adopted by* 2018 WL 1865168 (M.D. Ala. Apr. 18, 2018) (citing Sawyer and Calderon to show "impeachment evidence does not provide sufficient evidence of actual innocence to overcome a time bar").

When assessing the impact of a Brady violation, the Court should not, as Petitioner

suggests, simply disregard the testimony that should have been impeached and determine whether a jury would have convicted Petitioner without that testimony. (Doc. no. 14, p. 2). Instead, the Court must assess what the jury would have done "in light of that new evidence." Rozzelle, 672 F.3d at 1011; see, e.g., Wright, 169 F.3d at 705-06 (considering impact of new impeachment evidence on trial witness's testimony). In other words, if Petitioner's trial counsel had used the improperly withheld Brady evidence to impeach Fitzgerald at trial, would no reasonable juror likely have convicted Petitioner? The answer here is no.

Petitioner was convicted of felony murder for a robbery that turned into a shooting. Mitchell, 722 S.E.2d at 706-07. The facts are best recited by the Georgia Supreme Court in its opinion upholding Petitioner's conviction:

> At about 5:00 p.m. on October 25, 2007, [Wymberly] Baker, [Donald] Robinson, Isaac Fitzgerald, and Tereen Graham[5] were talking in front of Baker's house in Savannah, Georgia, when a stolen black Toyota Highlander with three or four people in it pulled up. Two men got out and said they were there to rob the victims, who began running. The two men then began shooting. Baker was fatally shot in the chest, and Robinson was shot in the arm. After [Petitioner] went through Baker's pockets, the two shooters jumped back in the SUV and fled the scene.
>
> Shortly after the shootings, the Highlander was found abandoned some distance away, with the doors open and the engine running. The Tech 9 and Ruger 9mm handguns used in the shootings were found near the parked SUV. Three eyewitnesses identified [Petitioner] as one of the shooters. There was also evidence that [Petitioner] and Williams were driving a black SUV earlier on the day of the crimes and that [Petitioner] had a Tech 9 handgun and Williams had a 9mm handgun that day.

Mitchell, 722 S.E.2d at 706-07. All three surviving victims—Fitzgerald, Robinson, and Graham—testified at trial, and the record shows each identified Petitioner as one of the

---

[5]Graham is misidentified as Green by the Georgia Supreme Court in Williams, 722 S.E.2d at 849.

9

shooters during photo lineups performed by Detective Keith Dennis throughout the investigation.  (Tr. 188, 1093, 1133-34, 1244-46, 1249-50, 1263-64, 1408-11, 1423.)[6] Robinson further testified he could see Petitioner during the shooting and witnessed him go through Baker's pockets.  (Tr. 1258-59.)

These identifications were not without equivocation.  On cross examination, Graham said he could not positively identify anyone despite doing so in the photo lineup.  (Tr. 1249-50.)  Robinson had first suggested the names Mustafa and Vincent Brown to investigators before eventually identifying Petitioner when he completed a photo lineup.  (Tr. 1261-62, 1419-23.)  Detective Dennis characterized Fitzgerald's identification as "waffly," and only Fitzgerald was able to identify Williams.  (Tr. 1408-10); Williams, 722 S.E.2d at 849.  All three witnesses were cagey on the stand.  Fitzgerald agreed his prior hesitation identifying Williams and Petitioner was due to fear and testified Williams had approached him threateningly at a club after the shooting.  (Tr. 1135-36, 1138-1141.)  Nonetheless, the record clearly shows Fitzgerald, Robinson, and Graham each identified Petitioner as one of those responsible for the shooting, and all stood by their identifications at trial.

There was also evidence against Petitioner other than statements from the victims. Jerry Mells testified he was near the scene of crime when two men matching Williams and Petitioners' descriptions ran by, and one of them stopped to ask to use Mells's phone.  (Tr. 1191-93.)  Mells identified that individual as Petitioner during a photo lineup with Detective Dennis a few days after the shooting, though he was unable to identify Petitioner during trial.

---

[6]The Court cites to the trial transcript ("Tr.") using the page numbers provided by the state habeas court.  The trial transcript may be found in Respondent's Exhibits 5(A)-5(G).  (Doc. nos. 21-1 to 21-7.)

(Tr. 1195, 1416, 1432-33.) Jamel Williams testified he met with Petitioner and Williams in the black Highlander on the morning of the shooting to sell marijuana and later told police Petitioner had a Tech 9 and Williams had a 9mm handgun. (Tr. 1361-64, 1367, 1406.) Accordingly, Savannah Police Department Corporal Dennis Malott found Petitioner and Jamel's fingerprints on the black Highlander. (Tr. 1314.) Venus McKinney, the mother of Williams's child, also told police Williams and Petitioner were in the black Highlander the night before the shooting and had weapons, but wavered on whether Petitioner was actually in the car and, on the stand, claimed she made the story up. (Tr. 1212-23, 1401, 1427-28, 1477-78.)

This evidence shows there is additional testimony and physical evidence supporting Petitioner's conviction other than Fitzgerald's testimony, and the jury probably did not accept Fitzgerald's identification "without reservation." See Calderon, 523 U.S. at 563; High, 209 F.3d at 1272. This Court has already characterized Fitzgerald's testimony as "iffy" even without evidence of an unofficial leniency deal that could have been used to impeach him. Williams, 232 F. Supp. 3d at 1324. Petitioner's counsel thoroughly cross-examined Fitzgerald, pointing to several prior statements by Fitzgerald where he questioned his own certainty and what led him to eventually name Petitioner. (Tr. 1142-46.) But Fitzgerald's identification of Petitioner was still stronger than his identification of Williams. Indeed, when Williams's counsel continued cross-examination of Fitzgerald, Fitzgerald testified he "didn't see anybody else" besides Petitioner before reasserting his identification of Williams at a photo lineup. (Tr. 1121-29.) So, Fitzgerald's testimony was already suspect, but the jury still voted to convict both Petitioner and Williams. Evidence of the leniency deal would have further discredited Fitzgerald, but the Court does not believe a reasonable juror would more likely than not have

responded with acquittal. As explained, impeachment evidence is "a step removed from evidence pertaining to the crime itself" and generally insufficient on its own to satisfy the actual innocence exception, especially considering the other evidence supporting Petitioner's conviction. See Calderon, 523 U.S. at 563; High, 209 F.3d at 1272; Wright, 169 F.3d at 704-5.

This outcome is easily reconciled with the outcome in Williams's federal habeas case. In part because "the State's case [against Williams] more or less hinged on . . . Fitzgerald," the Court in Williams found the Brady violation "easily undermined confidence in the verdict." Williams, 232 F.Supp.3d at 1325, 1332-33. However, the "undermine confidence" standard associated with post-conviction relief based on a Brady violation is easier to meet than the "no reasonable juror would convict" standard used for the actual innocence exception. As the Supreme Court held in Wearry v. Cain, "To prevail on his Brady claim, [Petitioner] need not show that he 'more likely than not' would have been acquitted had the new evidence been admitted. He must show only that the new evidence is sufficient to undermine confidence in the verdict." 577 U.S. 385, 392 (2016) (internal quotations and citations omitted); Williams v. Williams, 714 F. App'x 958, 963–64 (11th Cir. 2017) ("A reasonable probability is a probability sufficient to undermine confidence in the outcome . . . . The withheld evidence was material as it was reasonably probable that a different outcome would have resulted if the prosecution had disclosed its promise to Fitzgerald.")

### C. Testimony Regarding Donald Robinson and Vincent Brown

Petitioner's other two pieces of "new, reliable evidence" involve unprovided testimony or evidence regarding Donald Robinson and Vincent Brown. (Doc. no. 14, pp. 2-3.) Specifically, Petitioner points to (1) post-trial testimony by an investigator regarding

Robinson's post-trial recantation, and (2) testimony Brown would have given before the jury had he been called as a witness at trial. (Id.)

As mentioned, Robinson initially identified Brown as the shooter. Petitioner alleges Brown told a detective that Robinson visited Brown's home at some point accusing him of being the shooter. (Id. at 2.) First, the Court notes Robinson testified at trial he did not know where Brown lived. (Tr. 1263.) Second, Robinson testified the initial names he gave police were indeed Tito (Brown's nickname) and Mustafa (Brown's brother) because those were names Fitzgerald either suggested or suspected initially. (Tr. 1261-62, 1264-65, 1281.) However, Robinson also testified he witnessed someone exit the black Highlander and go through Baker's pockets, he could identify that person and did so at a photo lineup, and he eventually learned that person's name was Jay-Jay (Petitioner's nickname). (Tr. 1258-59, 1287, 1290-92, 1296, 1300-01.) Throughout thorough cross-examination, Robinson held strongly to his then-present belief that it was Petitioner, not Brown or Mustafa, who committed the act. (Tr. 1277-86.)

After the trial, Robinson spoke to two other individuals who supposedly at one point also believed Petitioner was the shooter. (Doc. no. 14, p. 3.) Those two individuals changed their stories and told Robinson they no longer believed Petitioner was the shooter. (Id.) Then, an investigator hired by Petitioner's defense counsel interviewed Robinson who recanted his trial testimony and also said Petitioner was not the shooter. (Id.) Though no exhibits nor evidence have been filed by Petitioner to support this claim, the Court presumes the investigator's "expected testimony" regarding Robinson's recantation is Petitioner's new, reliable evidence that was not presented at trial. (Id.)

The evidence is undoubtedly insufficient to satisfy the actual innocence exception. The

13

Eleventh Circuit "repeatedly [has] noted that 'recantations are viewed with extreme suspicion by the courts.'" In re Davis, 565 F.3d 810, 825 (11th Cir. 2009) (quoting United States v. Santiago, 837 F.2d 1545, 1550 (11th Cir.1988)).  Purported testimony from Petitioner's investigator regarding old, unsworn statements made by Robinson is not the kind of new, reliable evidence that would merit a finding of actual innocence.  The Court cannot view such evidence with anything *other* than suspicion.  The evidence is also nothing new.  Petitioner's prior naming of Brown was known at trial, and he was cross-examined under oath about why he changed his mind and named Petitioner.  Petitioner therefore has not met the lofty burden of showing "it is more likely than not that no reasonable juror would have convicted [the Petitioner]" with the new evidence.  McQuiggin, 569 U.S. at 394-95; See Schlup, 513 U.S. at 332 ("[T]he court may consider how the timing of the submission and the likely credibility of the affiants bear on the probable reliability of that evidence."); Ray v. Mitchem, 272 F. App'x 807, 810-11 (11th Cir. 2008) (*per curiam*) (emphasizing "actual innocence means factual innocence, not mere legal insufficiency" (citing Bousely v. United States, 523 U.S. 614, 623 (1998)).

Next, Brown's ungiven testimony regarding Robinson cannot constitute new evidence for the actual innocence exception.  As explained, evidence is only "new evidence" if it was unavailable at trial and could not have been discovered earlier through the exercise of due diligence.  Rivera, 2017 WL 6035017, at *11.  By arguing trial counsel was ineffective for not having Brown testify at trial, Petitioner admits that Brown's testimony was evidence that was available and discoverable at trial, albeit unused.  See id. at *12 (finding "previously existing evidence that trial counsel had in its possession but failed to use" was not new evidence).  In any event, Petitioner indicates Brown's testimony would have been used to merely impeach

14

Robinson's identification of Petitioner. The evidence is still impeachment evidence, which, as explained, is generally insufficient to support an actual innocence claim. See Calderon, 523 U.S. at 563; High, 209 F.3d at 1272; Wright, 169 F.3d at 704-05.

In sum, the Court finds the evidence touted by Petitioner as supportive of his actual innocence claim, both individually and collectively, is woefully inadequate to establish a fair probability that no reasonable juror would have found him guilty. Petitioner has not met the "exceedingly narrow" actual innocence exception, and the Court cannot excuse the untimeliness of his petition. Rozzelle, 672 F.3d at 1011.

### IV.    Leave to Appeal *In Forma Pauperis*

The Court should deny Petitioner leave to appeal *in forma pauperis* ("IFP") and a Certificate of Appealability ("COA"). An appeal cannot be taken IFP if the trial court certifies, either before or after the notice of appeal is filed, that the appeal is not taken in good faith. See 28 U.S.C. § 1915(a)(3); Fed. R. App. P. 24(a)(3)(A). Thus, because there are no non-frivolous issues to raise on appeal, an appeal would not be taken in good faith, and the Court should **DENY** Petitioner leave to appeal IFP. See 28 U.S.C. § 1915(a)(3).

Further, a prisoner seeking relief under § 2254 must obtain a COA before appealing the denial of his application for a writ of habeas corpus. The Court "must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11(a) to the Rules Governing Section 2254 Proceedings. The Court should grant a COA only if the prisoner makes a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). For the reasons set forth above, and in consideration of the standards enunciated

in Slack v. McDaniel, 529 U.S. 473, 482-84 (2000), Petitioner has failed to make the requisite showing.  Accordingly, the Court should **DENY** a COA in this case.[7]

## V.  CONCLUSION

For the reasons set forth above, the Court **REPORTS** and **RECOMMENDS** Respondent's motion to dismiss be **GRANTED**, (doc. no. 10), this petition be **DISMISSED** as untimely, and a final judgment be **ENTERED** in favor of Respondent.  The Court further **RECOMMENDS** Petitioner be **DENIED** leave to appeal IFP and a COA.

SO REPORTED and RECOMMENDED this 26th day of August, 2022, at Augusta, Georgia.

_____
BRIAN K. EPPS
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA

---

[7]"If the court denies a certificate, the parties may not appeal the denial but may seek a certificate from the court of appeals under Federal Rule of Appellate Procedure 22."  Rule 11(a) to the Rules Governing Section 2254 Proceedings.